1

2

3

4

5

6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

7 | JAMES COURTNEY and CLIFFORD
COURTNEY,

8
                              Plaintiffs,

9

v.

10

JEFFREY GOLTZ, et al.,

11
                              Defendants.

12

NO:  11-CV-0401-TOR

ORDER GRANTING MOTION TO
DISMISS

13      BEFORE THE COURT is Defendants' motion to dismiss for failure to state

14  a claim (ECF No. 7).  The Court heard oral argument on the motion on April 12,

15  2012.  Michael E. Bindas and Jeanette Petersen appeared on behalf of the

16  Plaintiffs, James Courtney and Clifford Courtney.  Assistant Attorney General

17  Fronda Woods appeared on behalf of the Defendants, Jeffrey Goltz, Patrick Oshie,

18  Philip Jones, and David Tanner.  The Court has reviewed the motions, the

19  responses, the record and files herein and is fully informed.

20

ORDER GRANTING MOTION TO DISMISS ~ 1

BACKGROUND

This lawsuit is a challenge to certain Washington statutes and administrative regulations that require an operator of a commercial ferry to obtain a certificate of "public convenience and necessity" from the Washington Utilities and Transportation Commission ("WUTC") before commencing operations.  Plaintiffs allege that these statutes and regulations, as applied to their proposed ferry services on Lake Chelan, violate their right "to use the navigable waters of the United States" under the Privileges or Immunities Clause of the Fourteenth Amendment. Defendants, all members of the WUTC, have moved to dismiss the Complaint for failure to state a claim on the ground that Plaintiffs do not have a Fourteenth Amendment right to operate a commercial ferry on Lake Chelan.

FACTS

The following facts are drawn from Plaintiff's Complaint and are accepted as true for purposes of this motion.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Plaintiffs James Courtney and Clifford Courtney ("the Courtneys") live in Stehekin, Washington.  Stehekin is a small, unincorporated community of approximately 75 residents located at the northwestern-most tip of Lake Chelan. Stehekin is a very isolated community: the only means of accessing the town are by boat, seaplane, or on foot.  Most residents and visitors reach Stehekin via a ferry

ORDER GRANTING MOTION TO DISMISS ~ 2

operated by Lake Chelan Boat Company.  At present, this is the only commercial ferry operating on the lake.

The Courtneys would like to establish a competing ferry service on Lake Chelan.  They believe that a competing service is needed for two main reasons. First, they believe that a second ferry, based in Stehekin, would better serve the needs of Stehekin residents than the existing ferry based in Chelan.[1]  Second, they believe that a second ferry would allow more tourists and visitors to reach Stehekin, thereby increasing patronage of Stehekin businesses—many of which are owned by the Courtneys.  To date, however, the Courtneys have been unable to obtain the requisite certificate of "public convenience and necessity" from the WUTC or otherwise obtain permission to operate a ferry on Lake Chelan.

The Courtneys' efforts to establish a competing ferry service have taken several forms.  First, in 1997, James Courtney submitted a formal application to the WUTC for a certificate of "public convenience and necessity" pursuant to RCW 81.84.010 and 020.  The WUTC's evaluation of this application culminated in a two-day evidentiary hearing at which the WUTC took testimony from James

---

[1] The city of Chelan is located at the southeastern-most tip of Lake Chelan.  The distance between Chelan and Stehekin is approximately fifty-five (55) miles by boat.

ORDER GRANTING MOTION TO DISMISS ~ 3

and others about (1) the need for an additional ferry; and (2) the financial viability of the proposed service.[2]  The WUTC ultimately denied James's application, finding that the proposed service was not required by "the public convenience and necessity," and that, in any event, James lacked the financial resources to sustain the proposed service for twelve months.  The WUTC further concluded that James had failed to carry his statutory burden of establishing that the incumbent carrier "ha[d] failed or refused to furnish reasonable and adequate service."  *See* RCW 81.84.020(1).

Second, beginning in 2006, James attempted to establish an "on-call boat transportation service" based in Stehekin.  Because James intended to use docks owned by the United States Forest Service in conjunction with this service, he

---

[2] Before issuing a certificate of "public convenience and necessity," the WUTC is required to determine that an applicant "has the financial resources to operate the proposed service for at least twelve months" and to evaluate "[r]idership and revenue forecasts; the cost of service for the proposed operation; an estimate of the cost of the assets to be used in providing the service; a statement of the total assets on hand of the applicant that will be expended on the proposed operation; and a statement of prior experience, if any, in such field by the applicant."  RCW 81.84.020(2).

ORDER GRANTING MOTION TO DISMISS ~ 4

applied to the Forest Service for a "special use permit." The Forest Service subsequently contacted the WUTC to verify that James's proposed use of its docks would comply with state law. In October of 2007, WUTC staff advised the Forest Service that the proposed service was exempt from the statutory "public convenience and necessity" requirement. In March of 2008, however, WUTC staff reversed course and advised James directly that he would need to obtain a certificate before commencing his on-call service.

Four months later, in July of 2008, WUTC staff reversed course once again and advised James that the on-call service would be exempt from the certificate requirement. The Forest Service, recognizing the apparent confusion among the WUTC staff, subsequently requested an "advisory opinion letter" on the issue from Defendant David Danner in August of 2009. For reasons that are unclear from the existing record, Defendant Danner declined to respond.

Also in 2008, Clifford Courtney contacted the WUTC and proposed two alternative boat transportation services. The first proposal was a "charter" service whereby Clifford would hire a private boat to transport patrons of his lodging and river rafting businesses between Chelan and Stehekin. The second proposal was a service whereby Clifford would "shuttle" his customers between Chelan and Stehekin in his own private boat.

ORDER GRANTING MOTION TO DISMISS ~ 5

In September of 2008, Clifford sent a letter to Defendant Danner seeking guidance about whether either proposed service would require a certificate of "public convenience and necessity."  Defendant Danner responded that, in his opinion, both services would require a formal certificate.  Specifically, Defendant Danner opined that even private boat transportation, offered exclusively to paying customers of Clifford's lodging and river rafting businesses, would be a service "for the public use for hire" for which a formal certificate was required pursuant to RCW 81.84.010.  Defendant Danner did, however, inform Clifford that his opinion was merely advisory in nature and that Clifford was free to seek a formal ruling on the issue from the full Commission.

Frustrated by the WUTC's responses to their formal application and subsequent proposals, the Courtneys contacted the Governor of the State of Washington and several state legislators in February of 2009.  The Courtneys explained the perceived need for a competing ferry service on Lake Chelan and urged their legislators to relax the ferry operator certification requirement.  In response, the State Legislature directed the WUTC to study the appropriateness of statutes and regulations governing commercial ferry operations on Lake Chelan. Pursuant to this mandate, the WUTC studied the issue and delivered a formal report to the State Legislature in January of 2010.  *See* Washington Utilities and Transportation Commission, *Appropriateness of Rate and Service Regulation of*

ORDER GRANTING MOTION TO DISMISS ~ 6

*Commercial Ferries Operating on Lake Chelan: Report to the Legislature Pursuant to ESB 5894*, January 14, 2010 (hereinafter "Ferry Report").[3]

In this report, the WUTC concluded, *inter alia*, that the existing ferry operator was providing satisfactory service and that no modification of the existing regulations was therefore necessary.  The WUTC did, however, discuss the potential for "limited competition" by private carriers within the confines of the existing statutory and regulatory framework:

> There are three ways for the Commission to allow some limited competition with an incumbent provider's service: (1) by defining an incumbent's protected geographic territory in a narrow fashion, (2) by concluding that the incumbent has failed to meet a public need that the applicant proposes to meet, or (3) by declining to require a certificate for certain types of boat transportation services that are arguably private rather than for public use.

Ferry Report at 12.  Although the WUTC believed that it was "unlikely that . . . any of these theories could be relied upon to authorize competing services on Lake Chelan," it nevertheless concluded that,

_____

[3] Available at:

http://www.wutc.wa.gov/webdocs.nsf/d94adfab95672fd98825650200787e67/b18a8709b0fbaba2882576b100799b46/$FILE/Appropriateness%20of%20Rate%20&%20Service%20Regulation%20of%20Commercial%20Ferries%20Operating%20on%20Lake%20Chelan_2010.pdf

ORDER GRANTING MOTION TO DISMISS ~ 7

> [T]here may be flexibility within the law for the Commission to take an expansive interpretation of the private carrier exemption from commercial ferry regulation. For example, the Commission might reasonably conclude that a boat service offered on Lake Chelan (and elsewhere) in conjunction with lodging at a particular hotel or resort, and which is not otherwise open to the public, does not require a certificate under RCW 81.84.[010].

Ferry Report at 15.

On October 19, 2011, the Courtneys filed this lawsuit challenging Washington's regulation of commercial ferry activity under the Fourteenth Amendment to the United States Constitution. The Courtneys' Complaint alleges that the applicable statutes and administrative regulations, as applied to their attempts to establish a competing ferry service on Lake Chelan, violate their right to "use the navigable waters of the United States" under the Privileges or Immunities Clause. The Courtneys have specifically limited their causes of action to their rights under the Fourteenth Amendment's Privileges or Immunities Clause and have expressly disclaimed reliance upon the Commerce Clause or any other constitutional provision. Accordingly, the court will limit its analysis to whether the Courtneys have stated a claim for relief under 42 U.S.C. § 1983 or 28 U.S.C. § 2201 *et seq*. for violations of a right guaranteed by the Privileges or Immunities Clause of the Fourteenth Amendment.

ORDER GRANTING MOTION TO DISMISS ~ 8

DISCUSSION

A motion to dismiss pursuant to Federal Rule of Evidence 12(b)(6) "tests the legal sufficiency of a [plaintiff's] claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). To survive such a motion, a plaintiff must allege facts which, when taken as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation and citation omitted). In order for a plaintiff asserting a cause of action under 42 U.S.C. § 1983 to satisfy this standard, he or she must allege facts which, if true, would constitute a violation of a right guaranteed by the United States Constitution. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). Similarly, a plaintiff seeking declaratory relief under 28 U.S.C. § 2201 must allege facts which, if true, would violate federal law. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 672 (1950) (holding that Declaratory Judgment Act did not expand subject-matter jurisdiction of federal courts). As discussed below, Plaintiffs' Complaint fails to satisfy these standards.

A. The "Right to Use the Navigable Waters of the United States"

The Courtneys have asserted two related causes of action. First, they allege that the State of Washington's ferry licensing laws infringe upon their right to provide a commercial ferry service open to the general public on Lake Chelan. Second, they claim that these same laws infringe upon their right to provide a *private* ferry service for patrons of their Stehekin-based businesses. Plaintiffs

ORDER GRANTING MOTION TO DISMISS ~ 9

contend that their right to provide these services is guaranteed by the Fourteenth Amendment's Privileges or Immunities Clause, which provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."  U.S. Const. amend. XIV, § 1.

In support of their claims, the Courtneys note that the Supreme Court has specifically delineated "[t]he right to use the navigable waters of the United States" as one of the "privileges or immunities" guaranteed to citizens of the United States under the Fourteenth Amendment.  *See Slaughter-House Cases*, 83 (16 Wall.) 36, 79-80 (1872).  Defendants apparently do not dispute that *Slaughter-House* established a Fourteenth Amendment right "to use the navigable waters of the United States."  Defendants argue, however, that this right does not extend to operating a commercial ferry service because regulation of such services has traditionally been reserved exclusively to the individual states.

At the outset, it is important to note that no federal court has ever directly examined the "right to use the navigable waters of the United States" referenced by the Supreme Court in *Slaughter-House*.  Given the absence of applicable precedent, this Court must attempt to define the "right to use the navigable waters of the United States" before determining whether, on the facts alleged in the Complaint, the right could have been violated.  The logical starting point for this analysis is the *Slaughter-House* decision itself.

ORDER GRANTING MOTION TO DISMISS ~ 10

In *Slaughter-House*, the Supreme Court was asked to decide whether a Louisiana statute which granted to a single corporation the exclusive right to operate a centralized slaughterhouse—to which all merchants were required to bring their animals for slaughter—violated the Thirteenth or Fourteenth Amendments.  83 (16 Wall.) at 66-67.  Before embarking on that task, Justice Miller, writing for a 5-4 majority, emphasized that the Court's consideration of the newly-adopted Thirteenth and Fourteenth Amendments must be informed by the history and purpose of their adoption.  *Id.* at 67-68, 71-72.  According to Justice Miller, "the one pervading purpose" of these amendments at the time of their adoption was to ensure "the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him."  *Id.* at 71.

With the history and purpose of the amendments thus established, the Court proceeded to consider whether the Louisiana statute violated the Privileges or Immunities Clause of the Fourteenth Amendment.  At the outset, the Court drew a crucial distinction between rights and privileges created by *state* citizenship and rights and privileges created by *United States* citizenship.  *See id.* at 72-77.  Specifically, the Court noted that the Fourteenth Amendment protects only "privileges or immunities of citizens of the *United States*" and that these rights are

1    *separate from* the "Privileges and Immunities" guaranteed to *state* citizens

2    referenced in Article IV.  *Id.* at 78.

3         According to the *Slaughter-House* majority, the "privileges or immunities"

4    referenced in the Fourteenth Amendment are a narrow category of rights "which

5    ow[e] their existence to the Federal government, its National character, its

6    Constitution, or its laws."  *Id.* at 79.  The "Privileges and Immunities" referenced

7    in Article IV, by contrast, are a broad category of "fundamental" rights conferred

8    by *state* citizenship, such as "protection by the government . . . the right to acquire

9    and possess property of every kind, and [the right] to pursue and obtain happiness

10   and safety."  *Id.* at 76, (emphasis omitted).  Notably, the Court further emphasized

11   that the latter category of rights "embraces nearly every civil right for the

12   establishment and protection of which organized government is instituted."  *Id.*

13   (citing *Ward v. Maryland*, 79 U.S. (12 Wall.) 418, 430 (1870)).

14        After drawing this crucial distinction between rights conferred by state

15   citizenship and rights conferred by United States citizenship, the Court concluded

16   that the right asserted by the petitioners—*i.e.*, the right to operate competing

17   slaughterhouse facilities[4]—was not a privilege of United States citizenship.  *Id.* at

18   [4] The majority carefully noted that the Louisiana statute did not "deprive[] a large

19   and meritorious class of citizens . . . of the right to exercise their trade," but merely

20   required all butchers "to slaughter at a specified place and to pay a reasonable

ORDER GRANTING MOTION TO DISMISS ~ 12

79.  Rather, the Court concluded that this was an economic right conferred by *state*

citizenship—a right that must yield to the lawful exercise of the state's "police

power."  *Id.* at 62, 78.  Accordingly, the Court held that the Louisiana statute did

not implicate the "privileges or immunities" protected by the Fourteenth

Amendment.  *Id.* at 80.

Before concluding its analysis of the "privileges or immunities" issue,

however, the *Slaughter-House* majority took an unusual step: it enumerated certain

rights which, though not implicated by the challenged statute, might nevertheless

be protected under the Fourteenth Amendment.

> Having shown that the privileges and immunities relied [upon by the
> petitioners] are those which belong to the citizens of the States as
> such, and that they are left to the State governments for security and
> protection, and not by [the Fourteenth Amendment] placed under the

compensation for the use of the accommodation furnished to him at that place."  83

U.S. (16 Wall.) at 60-61.  Accordingly, the Court framed the right at issue not as

the right to butcher animals in general, but rather the right of to operate competing

slaughterhouse *facilities*.  *Id.* at 61 ("[I]t is not true that [the statute] deprives the

butchers of the right to exercise their trade, or imposes upon them any restriction

incompatible with its successful pursuit . . . [i]t is, however, *the slaughter-house*

*privilege*, which is mainly relied on to justify the charges of gross injustice to the

public, and invasion of private right.") (emphasis added).

ORDER GRANTING MOTION TO DISMISS ~ 13

care of the Federal government, we may hold ourselves excused from
defining the privileges and immunities of citizens of the United States
which no State can abridge, until some case involving those privileges
may make it necessary to do so.

But lest it should be said that no such privileges and immunities are to
be found . . . we venture to suggest some which own their existence to
the Federal government, its National character, its Constitution, or its
laws.

*Id.* at 78-79.  The Court then proceeded to list several examples of rights that could

potentially be guaranteed by the Fourteenth Amendment.  One such example was

"[t]he right to use the navigable waters of the United States, however they may

penetrate the territory of the several States."  *Id.* at 79.

   B.  Plaintiffs' First Cause of Action: Operation of a Commercial Ferry Service
       Open to the Public

       Given the limited holding of the *Slaughter-House* case, this Court cannot

definitively conclude that the Fourteenth Amendment does in fact protect "the right

to use the navigable waters of the United States."  Because the *Slaughter-House*

majority merely "venture[d] to suggest" a number of rights that could be protected

under the Fourteenth Amendment—ostensibly to prevent the Privileges or

Immunities Clause from becoming a legal nullity—there is reason to question

whether "the right to use the navigable waters of the United States" is truly a

*recognized* Fourteenth Amendment right.  The fact that no federal court has ever

directly examined the "right" further reinforces this uncertainty.

ORDER GRANTING MOTION TO DISMISS ~ 14

Nevertheless, even if the right does in fact exist, the court Cannot conclude that the right extends to operating a commercial ferry open to the public on Lake Chelan.  At the Courtneys' urging, the Court has thoroughly reviewed the history and purpose of the Fourteenth Amendment's Privileges or Immunities Clause.  The Courtneys are correct that the overarching purpose of the clause at the time of the Fourteenth Amendment's adoption was the protection of the rights of newly-freed slaves following the Civil War.  *See Slaughter-House*, 83 (16 Wall.) at 71 (noting that the "one pervading purpose" of the Thirteenth, Fourteenth and Fifteenth Amendments was "the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him").

There is less support, however, for the Courtneys' assertions that the Privileges or Immunities Clause was designed to protect quintessentially *economic* rights.  While it is certainly likely that the oppression of former slaves in the wake of the Civil War resulted in adverse economic consequences, there is little to suggest that Congress viewed the Privileges or Immunities Clause as the primary vehicle through which former slaves would achieve economic equality.  Indeed, the Courtneys' focus on the economic underpinnings of the clause appears to give short shrift to the "one pervading purpose" of the Thirteenth, Fourteenth and Fifteenth Amendments: to eliminate *all* forms of institutional oppression of former slaves.  *Id.* at 71.

ORDER GRANTING MOTION TO DISMISS ~ 15

Moreover, the Courtneys' assertion that they have a Fourteenth Amendment right to operate a ferry business on Lake Chelan is inconsistent with the *Slaughter-House* decision itself. Like the right to operate competing slaughterhouse facilities at issue in *Slaughter-House*, the right to operate a competing commercial ferry service on Lake Chelan appears to derive from *state* citizenship rather than United States citizenship. *Cf. Saenz v. Roe*, 526 U.S. 489, 502-03 (1999) (holding that Fourteenth Amendment Privileges or Immunities Clause protects the right to travel between states). Notwithstanding *Slaughter-House*'s suggestion that the right to "use" the navigable waters of the United States derives from United States citizenship, the holding of the case counsels that using such waters *in the manner the Courtneys have proposed—i.e.*, to operate a competing commercial ferry business—is one of the "fundamental" rights conferred by state citizenship. *See id.* at 76 (holding that "the right to acquire and possess property of every kind" originates from state citizenship and is therefore not protected under the Privileges or Immunities Clause of the Fourteenth Amendment)[5]; *McDonald v. City of*

---

[5] The Court also notes that the *Slaughter-House* majority tacitly approved of an exclusive ferry franchise by declining to address a portion of the Louisiana statute which granted the slaughterhouse operator an exclusive right to run ferries on the Mississippi River between its several buildings on both sides of the river. *See* 83 U.S. (16 Wall.) at 43. The minority approved of an exclusive ferry franchise more

ORDER GRANTING MOTION TO DISMISS ~ 16

*Chicago*, __ U.S. __, 130 S. Ct. 3020, 3030-31 (2010) (declining to revisit

*Slaughter-House*'s narrow interpretation of the rights protected under the

Privileges or Immunities Clause).  Accordingly, the Court finds that the Courtneys

do not have a Fourteenth Amendment right to operate a commercial ferry service

open to the public on Lake Chelan.[6]

C.  Plaintiffs' Second Cause of Action: Operation of a Private Ferry Service to Patrons of Stehekin-Based Businesses

1.  *Standing*

Article III of the United States Constitution limits the jurisdiction of federal

courts to cases or controversies between litigants with adverse interests.  U.S.

explicitly: "It is the duty of the government to provide suitable roads, bridges, and

ferries for the convenience of the public, and if it chooses to devolve this duty to

any extent, or in any locality, upon particular individuals or corporations, it may of

course stipulate for such exclusive privileges connected with the franchise as it

may deem proper, without encroaching upon the freedom or the just rights of

others."  *Id.* at 88 (Field, J., dissenting).  However, the court expresses no opinion

as to the legality of an exclusive ferry franchise at this time.

[6] The Court expresses no opinion about whether the right to use the navigable

waters of the United States extends to "using" such waters for private

transportation services incidental to a land-based business.

ORDER GRANTING MOTION TO DISMISS ~ 17

Const. art. III, § 2, cl. 1.  The overarching purpose of this provision is to prevent federal courts from rendering advisory opinions in the absence of an actual dispute. *Flast v. Cohen*, 392 U.S. 83, 96-97 (1968).  Consistent with this mandate, litigants in federal court must establish the existence of a legal injury that is both "concrete and particularized [and] actual or imminent."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (plurality opinion) (internal quotation marks and citations omitted).  To satisfy this requirement in an action for declaratory and injunctive relief, a litigant must allege facts which "show a very significant possibility of future harm."  *San Diego Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996).  Accordingly, "[t]he mere existence of a statute, which may or may not ever be applied to plaintiffs, is not sufficient to create a case or controversy within the meaning of Article III."  *Stoinoff v. Montana*, 695 F.2d 1214, 1223 (9th Cir. 1983).

Here, the Courtneys' second claim does not present an actual case or controversy under Article III.  The Courtneys' second claim is based on Clifford Courtney's proposal to the WUTC in 2008 for one of two alternative boat transportation services.  The first proposal was a "charter" service whereby Clifford would hire a private boat to transport patrons of his lodging and river rafting businesses between Chelan and Stehekin.  The second proposal was a service whereby Clifford would "shuttle" his customers (lodging and river rafting patrons) between Chelan and Stehekin in his own private boat.

ORDER GRANTING MOTION TO DISMISS ~ 18

As the Courneys acknowledge in their complaint, the WUTC has never definitively ruled that their proposed "private" ferry service would in fact require a certificate of public convenience and necessity under RCW 81.84.010. While the Court commends the Courtneys for their good-faith efforts to resolve this issue with the WUTC over the past several years, it cannot ignore the fact that (1) the WUTC has given directly conflicting opinions about whether a certificate would be required; and (2) neither the WUTC nor any other state adjudicative body has ever officially ruled on the matter. Accordingly, the Court finds that it lacks subject-matter jurisdiction to entertain the Courtneys' second cause of action at this time. *San Diego Gun Rights Comm.*, 98 F.3d at 1126; *Stoinoff*, 695 F.2d at 1223.

2. *Ripeness*

Even if the Court had subject-matter jurisdiction, however, it would nevertheless decline to consider the Courtneys' second claim on prudential ripeness grounds.[7] In light of the lingering uncertainty about whether the

---

[7] During oral argument, counsel for the Plaintiffs correctly noted that the Courtneys are not required to exhaust their administrative remedies before filing a § 1983 claim. *Patsy v. Bd. of Regents of Florida*, 457 U.S. 496, 516 (1982). The lack of an exhaustion requirement, however, does not relieve the Courtneys of their obligation to establish that their claim presents a ripe controversy. *See McCabe v.*

ORDER GRANTING MOTION TO DISMISS ~ 19

Courtneys would be required to obtain a certificate of public convenience and

necessity to operate a private ferry service, the court concludes that further

consideration of the constitutionality of the challenged statutes at this juncture

would be premature.  *See Renne v. Geary*, 501 U.S. 312, 323-24 (1991)

(postponing ruling on whether provision of the California constitution violated the

First Amendment where provision did not clearly apply to petitioners and where

"permitting the state courts further opportunity to construe [the provision could] ...

materially alter the question to be decided") (internal quotation and citation

omitted).  This conclusion is further reinforced by the WUTC's most recent

pronouncement that "there may be flexibility within the law for the commission to

take an expansive interpretation of the private carrier exemption from commercial

ferry regulation."  *See* Ferry Report at 15.  In light of the WUTC's apparent

willingness to consider an interpretation of the statute that would not implicate the

---

*Arave*, 827 F.2d 634, 639 (9th Cir. 1987) ("While there is no requirement that

administrative remedies be exhausted in cases brought under 42 U.S.C. § 1983, the

claim must be ripe, and not moot, to be reviewed properly.") (internal citations

omitted).

ORDER GRANTING MOTION TO DISMISS ~ 20

Fourteenth Amendment, the court concludes that the Courtneys' second claim is

unripe for present adjudication.[8]

       3. *Abstention*

       Finally, even if the Courtneys' second claim was ripe for review, the Court

would abstain from deciding the constitutional question presented under the

"abstention doctrine" set forth in *Railroad Comm'n of Texas v. Pullman Co.*, 312

---

[8] The Court acknowledges that an as-applied challenge to RCW 81.84.010—which

the Courtneys have asserted in this case—is more likely to present a ripe

controversy than a facial challenge. *See, e.g.*, *Brockett v. Spokane Arcades, Inc.*,

472 U.S. 491, 501-02 (1985) (articulating preference for deciding constitutional

questions on the facts of a specific case rather than in the abstract). Nevertheless,

when a § 1983 plaintiff asserting an as-applied challenge fails to seek a conclusive

determination as to whether the challenged statute will in fact be applied in the

manner asserted, a ripe controversy does not exist. *See Shelter Creek Dev. Corp. v.*

*City of Oxnard*, 838 F.2d 375, 379-80 (9th Cir. 1988) (dismissing as unripe an as-

applied constitutional challenge under § 1983 where plaintiffs never formally

applied for a special use permit, and, consequently, the defendant city never

rendered a "final and authoritative determination as to how the [challenged land

use] ordinance applied" to the plaintiffs' property).

U.S. 496 (1941).  Under *Pullman*, a federal court must abstain from deciding a federal constitutional question when the resolution of that question hinges on competing interpretations of a state statute.  *Id.* at 499-500.  In such situations, the "last word" on the meaning of the state statute belongs to the state courts.  *Id.*  The reasons for this deference are twofold.  First, deferring to a state court on a question of state law prevents a federal court's interpretation of a state statute from being "supplanted by a controlling decision of [the] state court" at a later time.  *Id.* at 500.  More importantly, however, this deference embodies a "scrupulous regard for the rightful independence of the state governments."  *Id.* at 501.

As discussed above, Washington's ferry certification requirement applies to "commercial ferr[ies] . . . for the public use for hire."  RCW 81.84.010.  Whether this definition applies to the Courtneys' proposed "private" ferry service remains an open question.  If the WUTC or the Washington State courts determine that the proposed service *does* qualify as a "commercial ferry . . . for the public use for hire," then enforcement of the certificate requirement could potentially violate the Courtneys' Fourteenth Amendment rights.  On the other hand, if either entity determines that the proposed service *does not* qualify as a "commercial ferry . . . for the public use for hire," then the certificate requirement will not—indeed, cannot—be enforced against the Courtneys.  In the latter scenario, the Courtneys' constitutional challenge to the certificate requirement is moot.  Accordingly, the

court concludes that the Courtneys' second claim must be dismissed without

prejudice to afford the WUTC or the Washington State courts an opportunity to

resolve this unsettled question of state law. *Pullman*, 312 U.S. at 501.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

Defendants' motion to dismiss (ECF No. 7) is **GRANTED**. Plaintiffs' first

cause of action is **DISMISSED** with prejudice. Plaintiffs' second cause of action

is **DISMISSED** <u>without</u> prejudice. The District Court Executive is hereby directed

to enter this Order and furnish copies to counsel.

**DATED** this 17th day of April, 2012.

*s/ Thomas O. Rice*

THOMAS O. RICE
United States District Judge